**In re Georgia Erica HALL, Debtor.**

**Bankruptcy No. 897–88020–288.**

United States Bankruptcy Court,
E.D. New York.

Feb. 4, 1998.

Raymond W. Verdi, Garden City, NY, for Debtor.

Julie M. Sepenoski, Golden, Wexler & Sarnese, P.C., Garden City, NY, for Republic National Bank.

### OPINION ANNULLING AUTOMATIC STAY

STAN BERNSTEIN, Bankruptcy Judge.

I. Issue:

Should the automatic stay be annulled to validate a postpetition mortgage foreclosure

sale in this chapter 13 case? Under the totality of the circumstances in this case, the motion to annul the automatic stay should be granted.

## II. Background:

### A. The Foreclosure Action.

On November 20, 1991, Republic National Bank of New York f/k/a The Manhattan Savings Bank (Republic) made a $210,000 first mortgage loan to finance the purchase by the debtor of a residence in Commack (Long Island), New York. Less than three years later, the debtor defaulted on her loan. By the date the debtor received the notice of acceleration, her prior payments had reduced the principal balance by less than $4,000. In 1994, Republic began a foreclosure action in the Supreme Court of the State of New York, Suffolk County. The Court granted a judgment of foreclosure and sale. That judgment was docketed in the County Clerk's Office on May 30, 1996. Republic then notified the debtor that the foreclosure sale would be held on July 1, 1996.

### B. The Serial Bankruptcy Filings.

#### 1. The First Filing.

The debtor filed four bankruptcy petitions in a row within less than two years to frustrate the foreclosure sale. Her first petition was filed under chapter 13 with the assistance of counsel on June 28, 1996, Case No. 896–84232–20, two days before the scheduled sale. After the debtor failed to appear for the meeting of creditors and to make interim plan payments, her case was dismissed. This order of dismissal, entered by this judge's predecessor, was with prejudice to the debtor's filing another chapter 13 petition for 180 days.

#### 2. The Second Filing.

Republic then sent notice to the debtor of a second sale, scheduled for December 9, 1996. Once again, the debtor filed a bankruptcy petition on December 6, 1996, Case No. 896–87535–288, three days before the scheduled sale. This second petition was filed, however, under chapter 7. The same law firm which represented the debtor in her first case represented her in this second case. By virtue of filing under chapter 7, the debtor discharged any personal liability for any potential deficiency judgment that could arise from the foreclosure sale. Rather than incur the costs of moving to lift the stay, Republic waited until the order of discharge was entered on April 8, 1997. That order lifted the stay by operation of law.

#### 3. The Third Filing.

Republic sent notice to the debtor of a third sale, scheduled for June 18, 1997. Repeating her prior history, the debtor filed her third petition—this time under chapter 13 and on a pro se basis—on June 17, 1997, only one day before the scheduled sale. This third petition (and second chapter 13 case) was dismissed on September 2, 1997 because the debtor failed to appear for the meeting of creditors and failed to make any interim payments under a proposed plan.

#### 4. The Fourth Filing.

Republic sent its notice to the debtor of the fourth sale, scheduled for October 30, 1997. On October 24, 1997, the debtor filed her fourth bankruptcy petition—her third under chapter 13 and again on a pro se basis, six days before the scheduled sale. The debtor took no steps to notify Republic immediately of her latest filing. The notice of commencement of the case was mailed on behalf of the Clerk's Office the day of the sale, but it was not received by Republic until after the sale had been held by the state court-appointed referee. At the sale, Republic made a credit bid of $250,000, at least $60,000 less than its judgment amount, after adding accrued interest, fees, costs, and advances for real estate taxes and insurance.

### C. Republic's Proof of Claim.

On December 12, 1997, Republic filed its proof of claim. Assuming the foreclosure judgment and sale were avoided, the principal balance was $206,664.54 as of April 1, 1994. As of the petition date, the prepetition arrears in this fourth filing was $146,690.40. Of that sum, Republic had already incurred fees and costs (including advances to pay

delinquent real estate taxes) of $10,753.28 in connection with the foreclosure proceedings. The total claim was $353,354.94 as of the petition date.

By October of 1997, according to Republic, the debtor had made but one payment on her mortgage note in forty months, and she had not paid the real estate taxes assessed against the property during that entire period. After adding "present value interest," the monthly amount of payments on the arrearage increased to at least $2,700. On the "current debt service," the monthly amount of principal, interest, taxes and insurance was $2,385.38. So the total monthly payment for current debt service and arrearage would exceed $5,000, a huge payment for even an upper middle-class debtor.

### D. The Debtor's Schedules.

On the debtor's Schedule A (Real Property), the value of her residence was listed at $260,170, but the amount of the secured claim was listed to $380,000. The debtor listed no creditors other than Republic. On its face, this single-creditor case made absolutely no economic sense for the debtor—why pay $120,000 (exclusive of continuing current interest) in mortgage payments more than the value of the property?

Her total combined monthly income on Schedule I was $3,780, with expenses of $3,523 (including current debt service of $2,683 to Republic), leaving $257 a month to be paid over 60 months against the arrearage. On the face of these schedules, any plan funded solely from the debtor's net income could not be confirmed.

### E. The Motion for Annulment.

Republic finally had enough. On November 21, 1997, it filed a motion in the alternative (i) to annul the automatic stay in order to validate the foreclosure sale on a retroactive basis, or (ii) to have the case dismissed with prejudice to the debtor's refiling any further petitions in bankruptcy for one year. After receiving notice of the motion, the debtor retained experienced bankruptcy counsel. (This counsel had not represented the debtor in her first two bankruptcy cases.) In the affirmation in opposition to the mo-

tion, debtor's counsel represented that his client was prepared to cure the arrearage and to pay the postpetition debt service. The primary source of funding would be her mother.

In this district, the practice has developed that if a non-debtor submits an affidavit of support of a chapter 13 debtor's plan, and presents satisfactory evidence to the chapter 13 trustee of sufficient net income to meet the projected contributions to the plan, the plan may be confirmed. In one recently reported opinion in this district, the bankruptcy court conditioned confirmation of the plan upon the non-debtor's having a duty to contribute to the support of the debtor. *In re Antoine*, 208 B.R. 17 (Bankr.E.D.N.Y. 1997). Under the circumstances, at the preliminary hearing, this Court continued the motion to annul the stay to January 22, 1998—the next regular date for hearings with this trustee, so that the debtor could satisfy the trustee that this proffer of a contribution from the debtor's mother was bona fide and within the financial means of the debtor's mother. The debtor was directed to submit evidence of the necessary level of support to the chapter 13 trustee and Republic, substantiated by pay stubs, income tax returns, and whatever other information was deemed appropriate by the trustee.

On January 18, the debtor's counsel formally conceded defeat. After reviewing Republic's proof of claim, filed on December 12, 1997, counsel stated in his affirmation, that just to pay the arrearage, debtor's plan would have to be amended to pay in excess of $2,700 a month for 60 months. That amount, and presumably the current debt service, proved to be more than the debtor and her mother could manage. Under the circumstances, the debtor now modified her earlier response to Republic's motion by withdrawing her opposition to dismissal of the case with prejudice to any refiling for one year. The debtor, however, reiterated her opposition to the annulment.

The final hearing on this matter was held, as scheduled, on January 22, 1998. At the same hearing, the Court also considered the trustee's motion to dismiss the case with

prejudice. (The trustee filed his motion because the debtor had failed to make each of the interim payments called for under the original plan.) The Court entertained brief argument against the annulment by the debtor's counsel. The nub of the debtor's argument was that, unlike other cases, there was equity in this property, that she had made at least two postpetition payments directly to Republic since counsel began representing her, and that she had also remitted interim plan payments to the trustee. In this latter instance, the debtor's counsel discovered to his momentary embarrassment that the debtor had sent interim plan payments to the trustee in her last chapter 13 case, Michael F. Macco, Esq., and not to the standing trustee assigned to this chapter 13 case, Sanford Weinberg, Esq.

Republic's counsel conceded that the bank had received about $5,392.40 in postpetition payments. That was, however, less than the aggregate amount due for two months; moreover. Nor did that not change the fact that the debtor could not fund an amended plan, and that the debtor had not notified Republic of her fourth filing before it made its credit bid at the foreclosure sale.

The trustee stated that he took no position whether annulment was an appropriate remedy in this case, but he recommended dismissal with prejudice against any further chapter 13 filing for 180 days.

## III. Discussion.

### A. Introduction.

■ As a practical matter, if the motion for annulment were not granted, Republic would be forced to reschedule a fifth foreclosure sale. This would impose additional costs for advertising the sale while the debtor continues to live "rent-free" in the premises. Before that sale were held, the debtor would also have the opportunity to file an application for an order to show cause in the state court to delay the sale or, if the sale were allowed to go forward, then to delay the delivery of the referee's deed of sale to the successful bidder at the sale. From this Court's review of state court pleadings, attached by mortgagees as exhibits to plead-

ings in similar chapter 13 serial filings, orders to show cause are, in fact, sometimes granted upon the very same grounds that this Court and many other bankruptcy courts have repeatedly ruled are an inadequate basis for denying or postponing the creditor's motion to vacate the automatic stay. And if the debtor is adept at stretching out the state court process for a period six months, including motions for reconsideration or appeals; she could then refile with this Court, and start all over again, presumably either pro se or with new counsel. The Court is not making any finding that this particular debtor was intent upon such a tactical course of further delay in the state courts; but other debtors similarly situated have surely followed that tactical course. Under the circumstances, dismissing this fourth filing with prejudice to a fifth refiling for six months would be an inadequate equitable remedy.

■ All bankruptcy judges should and do give considerable deference to the premise that Congress intended to make chapter 13 available for debtors to save their homes. But persistent abuses through serial filings override this premise. For the varied judicial response to abuses by debtors in the Second Circuit, see *F.D.I.C. v. Cortez,* 96 F.3d 50 (2nd Cir.1996); *In re Felberman,* 196 B.R. 678 (Bankr.S.D.N.Y.1995); *In re Eatman,* 182 B.R. 386 (Bankr.S.D.N.Y.1995); *In re Prud'Homme,* 161 B.R. 747 (Bankr. E.D.N.Y.1993); *In re Bresler,* 119 B.R. 400 (Bankr.E.D.N.Y.1990). For decisions from other circuits, see also *In re Jolly,* 143 B.R. 383 (E.D.Va.1992), *aff'd w/o op.,* 45 F.3d 426 (4th Cir.1994); *In re Yimam,* 214 B.R. 463 (Bankr.D.Md.1997); *Leavitt v. Soto (In re Leavitt),* 209 B.R. 935 (9th Cir. BAP 1997) *Great Western Bank v. Snow (In re Snow),* 201 B.R. 968 (Bankr.C.D.Cal.1996).

### B. Postpetition Foreclosure Sales: Void or Voidable?

Read literally, under subsections 362(a)(1), (2), (3), (5), or (6), a mortgagee's proceeding with a foreclosure sale would be a violation of the automatic stay. The holding of a foreclosure sale is indisputably an act of lien enforcement against the property in which the debtor and/or the estate may have an inter-

est. As a general rule, the validity of a postpetition foreclosure sale should not turn on whether the foreclosing mortgagee received notice of the bankruptcy petition before the sale date. So even if the foreclosing creditor did not have actual knowledge of the bankruptcy filing and, therefore, of the automatic stay, one would expect that a bankruptcy court would still determine that the postpetition sale was a "nullity." The only respect in which a mortgagee's having actual knowledge of the filing and of the resulting automatic stay matters is in the imposition of actual and/or punitive damages for an intentional violation of that stay by going forward with the foreclosure sale. By contrast, when the mortgagee goes forward with the sale without actual knowledge of the filing, then a bankruptcy court will usually determine the sale to be a nullity, but not impose any sanction against the mortgagee.

The Court of Appeals for the Second Circuit earlier held that any act to collect or enforce an indebtedness would be treated as "void." See *In re 48th Street Steakhouse, Inc.*, 835 F.2d 427 (2d Cir.1987), *cert. denied, sub nom. Rockefeller Group, Inc. v. 48th St. Steakhouse, Inc.*, 485 U.S. 1035, 108 S.Ct. 1596, 99 L.Ed.2d 910 (1988). The concept of "voidness" is inflexible and, when strictly applied, does not permit any equitable factors to be considered. This "bright-line" rule carries with the advantages (and disadvantages) of all such rules. The Court of Appeals for the Second Circuit has as yet to overrule this decision explicitly by holding that concept of "voidness" should be replaced by a more flexible standard of "voidability."

Both before and after *48th Street Steakhouse*, other circuits held that acts of collection or enforcement in apparent violation of the automatic stay should be treated as merely "voidable," and not "void." See *Sikes v. Global Marine, Inc.*, 881 F.2d 176 (5th Cir.1989), followed in *Jones v. Garcia (In re Jones)*, 63 F.3d 411, 412 & n. 3 (5th Cir.1995), *cert. denied*, 517 U.S. 1167, 116 S.Ct. 1566, 134 L.Ed.2d 666 (1996); *Albany Partners Ltd. v. Westbrook (In re Albany Partners, Ltd.)*, 749 F.2d 670, 675 (11th Cir.1984); *Bronson v. United States*, 46 F.3d 1573, 1578–79 (Fed.Cir.1995); *In re Schwartz*, 954

F.2d 569, 571 (9th Cir.1992); *Job v. Calder (In re Calder)*, 907 F.2d 953, 956 (10th Cir. 1990)(per curiam).

Between 1993 and 1996, several circuits moved from the "void" to the "voidable" camp. See *Easley v. Pettibone Mich., Corp.*, 990 F.2d 905, 911 (6th Cir.1993); *In re Siciliano*, 13 F.3d 748 (3d Cir.1994); and *Soares v. Brockton Credit Union (In re Soares)*, 107 F.3d 969 (1st Cir.1997). Depending upon the composition of the panel, the Tenth Circuit may or may not continue to follow the "voidness approach." Compare *Ellis v. Consolidated Diesel Electric Corp.*, 894 F.2d 371 (10th Cir., 1990) with *Calder*, 907 F.2d at 953.

For understandable reasons, the distinction between "void" and "voidable" has been increasingly blurred. Determining that some significant enforcement action is void without considering the specific context in which that action is taken is an approach that frankly offends a modern judicial sensibility. So one transitional approach, to "save the appearances" of the "voidness" doctrine, is for the courts to adopt a host of context-specific equitable exceptions. Of course, once a court starts down that road, there is really no substantive difference between "voidness, subject to equitable exceptions," and "voidability, upon an equitable showing." Unless one is sensitive to this transitional shift, one risks the danger of holding to the absolutist view of "voidness" at a time when that approach has been all but abandoned in the evolving case law. At this stage in the development, it still appears, however, that the Second Circuit may be the only hold-out among all the reporting circuits of the "voidness" standard, but a recent ruling by the Second Circuit suggests otherwise.

In *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522 (2d Cir.1994), the Second Circuit cited *48th St. Steakhouse*, but distinguished that decision in a manner to suggest that the current court is now refocusing—to borrow a metaphor from basketball—on its "transition game." After considering the change in approach of all the other circuits and the thrust of *Rexnord*, is likely that the next time the issue of a postpetition foreclosure sale is squarely presented to the Circuit, the Circuit will jettison the absolutist approach of "voidness" and will realign itself with all

of the other circuits. Now let us review the *Rexnord* decision. At the trial court, Rexnord sought to enforce a default in a settlement agreement that Bidermann had entered into to settle a prior contract dispute. In essence, Bidermann could not meet the payment schedule under his settlement agreement, and Rexnord brought a motion to enforce the stipulation. The district court held a hearing at which Bidermann failed to produce any evidence to support his opposition to the entry of a judgment. The court endorsed the motion paper at the conclusion of the hearing, and so ordered the record. That afternoon, Bidermann filed a chapter 11 petition, and notified the court and the plaintiff's counsel of the filing. The next day the clerk made an entry of the judgment on the docket. That violated the automatic stay, alleged the debtor.

The Second Circuit held that there was no continuation of a judicial proceeding following the bankruptcy petition filing; that the clerk's act was merely or simply ministerial, and that does not count as a violation of the stay. If the *Rexnord* court intended to follow the voidness doctrine of *48th St. Steakhouse,* it would not have mattered whether the specific act in question was ministerial or judicial. There is a slight danger that *Rexnord* will be read too literally, and will be held to stand for the proposition that with respect to the automatic stay, the universe is divided into "acts" of judges in determining matters in controversy, i.e., making judgments, and "non-acts" of non-judges in the collection of debts and enforcement of judgments, etc. To draw this distinction substitutes an approach as intellectually unsatisfactory as the prior "voidness" approach. In another sense, *Rexnord,* if read too literally, may tend to overstate the legal significance of "deliberative acts" by judges and to understate the legal significance of the "non-discretionary acts" of the formal "actors" in the extended universe of those who "implement" judicial orders, whether as clerks of the court docketing judgments, court-appointed referees conducting foreclosure sales, or sheriffs executing writs or warrants. More importantly, many activities of the non-judicial "ministers" in our contemporary court-affiliated bureaucracy, in fact, exercise considera-

ble discretion in performing their duties that directly affect legal relationships among parties in interest. When non-judicial officers perform purely ministerial acts (or, non-acts, as it were), that covers only the most minor part of their "job description." For these reason, *Rexnord* does not go to the heart of the matter when considering violations of the automatic stay. In this respect, *Rexnord* is a limiting and ultimately a trivial case, and if it is not exactly a paradigm shift from *48th St. Steakhouse,* it is at least a "constructive abandonment" of the voidness doctrine.

If we were to try to "save the appearances" of *Rexnord,* we could perhaps say that the court-appointed referee, when he or she conducts the foreclosure sale, is engaging in a ministerial act, one that does not entail any further exercise of discretion by a judicial officer. If the state process entailed a further order confirming the foreclosure sale, then there might be a different outcome, if *Rexnord* were to be applied literally. As a general rule of New York state law, there is no statutory requirement for the entry of an order by the state court, which issued the judgment of foreclosure, confirming the sale. Therefore, there is no necessary occasion for a postsale exercise of judgment or discretion. This leaves the door open for avoiding the referee's sale as a non-judicial act upon a proper and strong showing of cause.

C.  Annulment of the Automatic Stay.

Another way of escaping the black hole of "voidness" is to point out that under section 362(d), one of the statutorily designated forms of equitable relief, other than modifying or terminating the automatic stay, is annulling it. Following a conventional rule of statutory construction, each substantive term in the Bankruptcy Code has to be given its plain meaning. If Congress intended to restrict the range of judicial responses to modifying or terminating the automatic stay or, on the other side of the coin, denying a request for such relief, then how does one explain the listing of "annulling" as one of the formally recognized decisional alternatives? In this respect, for a court to exclude the possibility of "annulling" the automatic stay, invariably with retroactive effect, by

embracing the "voidness" approach is to ignore the plain words of the statute and the legislative intent of Congress.

The Eleventh Circuit had squarely faced the issue of annulment in its 1984 *Albany Partners* decision:

> It is true that acts taken in violation of the automatic stay are generally deemed void and without effect [citing cases]. Nonetheless, section 362(d) expressly grants bankruptcy courts the option, in fashioning appropriate relief, of "annulling" the automatic stay, in addition to merely "terminating" it ... As stated in 2 Collier's Bankruptcy Manual Section 362.06 (3d ed.1983):
>
> > In addition to the obvious power to terminate the stay, section 362(d) also gives the bankruptcy court the power to annul the stay. The difference between the two is that an order annulling the stay could operate retroactively to the date of the filing of the petition which gave rise to the stay, and thus validate actions taken by a party at a time when he may have been unaware of the existence of the stay. On the other hand, an order terminating the stay would be operative only from the date of its entry.

Conrad B. Duberstein, C.J., distinguished *48th St. Steakhouse* when he granted a motion for annulment. See *In re Bresler*, 119 B.R. 400 (Bankr.E.D.N.Y.1990). See also that court's earlier decision, *In re Columbus Broadway Marble Corp.*, 84 B.R. 322 (Bankr. E.D.N.Y.1988). In *Bresler*, a judgment of foreclosure was entered against the debtor in a state court action. The secured indebtedness was about $176,000. A foreclosure sale was scheduled for March 15, 1990. But on the day before the sale, the debtor's attorney contacted the secured creditor's counsel and sought a postponement of the sale based upon a representation that the debtor had a purchaser who was in the process of obtaining financing for the mortgaged property. The creditor agreed to a two-week adjournment of the sale until March 29, 1990. When the debtor failed to produce his purchaser for the property, the mortgagee then had the referee sell the property to a third party for $271,000, including the $90,000 in prior un-paid real estate taxes. But undisclosed to the creditor, the debtor had filed a chapter 11 petition the day before the sale. The creditor responded after learning of the filing an order to show cause to lift the stay retroactively to the date of filing. At the return date, there was no appearance by the debtor or her attorney. The court granted the relief sought. No appeal was filed, and nothing happened from April 30, 1990, the date of the order, until August 20—when more than 14 weeks later, the debtor moved for an order to show cause why the retroactive provision of the prior order should not deleted.

Why did the debtor wait to August to file an application for an order to show cause? The debtor's explanation was that it took that long to line up financing. But by Sept. 11, the return date, the financing was still not in place. Nor was there any evidence whatsoever to suggest a price would be bid by the debtor at a later sale higher than the prior bid. A second sale would mean additional cost and delay.

On strict section 362(d) grounds, the *Bresler* court held that there was no equity in the property and no plan was in prospect, nor was there any offer of adequate protection—the priority of the lien for unpaid real estate taxes kept eroding the value of the mortgagee's lien. Moreover, the sale had been properly advertised and conducted in a commercially reasonable manner. The egregious gamesmanship by the debtor and the debtor's counsel apparently outweighed any consideration of the fact was that this chapter 13 case was a first time filing.

The *Bresler* court found that under the "extraordinary facts and circumstances" of that particular case, it would not follow the "voidness" rule. The precedential effect of *48th St. Steakhouse* was discounted by describing that holding as "broad and sweeping," and by commenting that a majority of other courts recognized equitable exceptions to the "voidness rule," specifically citing the decision of the Eleventh Circuit in *Albany Partners*. In the most limited sense, the rationale of "voidness" is a far more general standard than the Court of Appeals needed

to decide that particular case. *48th St. Steakhouse* dealt with a postpetition action to terminate a lease of a non-debtor party. So if we were to say that the automatic stay deals with several different member of a family of disruptive collection or enforcement actions, it makes sense to differentiate among the different branches of that family. Terminations of leases are quite different in very many procedural and substantive respects as a matter of state law from the foreclosure of mortgages. Under this light, *48th St. Steakhouse* should be construed as limited to violations of the automatic stay involving real estate leases, and leave the issues raised by postpetition foreclosure remedies to another day. If this approach strikes one as too rooted in nominalism, then perhaps *Bresler* may be restated in far more obvious terms. When under the totality of the circumstances, the failure or refusal of a bankruptcy court to annul a postpetition sale rewards grossly inequitable conduct on the part of the debtor, then the voidness approach of *48th St. Steakhouse* must be read to permit an equitable exception. At its very core, bankruptcy courts are courts of equitable jurisdiction. If these courts ever abandon the doctrine of "unclean hands" in favor of woodenly following bright-line legal rules of voidness, they will have lost their *raison d'etre*.

In an unpublished opinion, Melanie L. Cyganowski, J., *In re DaSilva,* Case No. 094–70787–511 (Bankr.E.D.N.Y. June 21, 1994) denied a motion to annul the automatic stay in order to validate a judgment of foreclosure and later foreclosure sale. After a careful analysis of the complicated facts in serial filings by the debtor and his spouse and the various intervening events in the foreclosure process, the court held that the mortgage company had failed to present any equitable showing for annulment. Among the important findings which were adverse to the movant was the entry of a judgment of foreclosure by the state court several weeks **after** the debtor's bankruptcy petition. As noted above, the entry of a judgment by a state court judge is viewed by every court of appeals circuit to be a material exercise of discretionary authority. The entry of a judgment (as juxtaposed to the docketing of a judgment) cannot be swept under the carpet as some sort of ministerial act. *DaSilva* is quite consistent with *Bresler* in so far as the movant for an annulment bears the burden of showing sufficient equitable factors in each particular case that would justify so extraordinary a form of equitable relief as annulment.

At the district court level, Anthony D. Spatt, J. in an unpublished memorandum opinion, dated Sept. 16, 1995, upheld a annulment order of then Robert John Hall, J. of November 23, 1993, and found an exception for annulments to *48th St. Steakhouse* in his *Mary Nelson v. Green Point Savings Bank (In re Nelson),* CV 93–5829, 94–0675. In *Nelson,* Judge Spatt pointed out that in *48th St. Steakhouse,* that court was not faced with a motion to annul the stay or to lift the stay retroactively. Unlike *Bresler, Nelson* turns on a finding of abusive and serial chapter 13 filings, and so it is more in point for purposes of this case.

In *Nelson,* the final bankruptcy petition in the series was filed on June 7, 1993, the day before the previously scheduled foreclosure sale. The mortgagee was the bidder at the sale. This case was later dismissed on Oct. 19, 1993 by the trustee. Green Point claimed that it was not aware of the filing of the petition until Oct. 28, 1993, the day that the debtor filed an application for an order to show cause to reopen her case and set aside the foreclosure on the ground that it violated the automatic stay. On Nov. 23, 1993, the bankruptcy court denied the motion to reopen and vacate the foreclosure sale. Green Point pointed out to the bankruptcy court that the debtor or her co-owner had filed **seven petitions**—this time round it was the debtor's debtor fifth filing in six years. All prior cases had been dismissed or the stay lifted within seven months of each filing date.

This nonsense continued through the appeal. The bankruptcy court denied a motion for a stay pending appeal; the district court granted that motion on Dec. 23, 1993, conditioned upon the debtor's making monthly mortgage payments to Green Point for use and occupancy. By Order to Show Cause, issued on Feb. 2, 1995, the appellee moved to vacate the stay because of the appellant's default in payments under the order. The motion was not opposed. By letter dated Feb. 15, 1995, the debtor's lawyer wrote to the court representing that he could not oppose the motion because the appellant failed to keep appointments to address the issues raised in the motion. By order, dated Feb. 17, 1995, the court vacated the stay. The District Court pointed out that this was a bad faith filing—it did not matter that more than 180 days had passed since the last dismissal. The last payment on this mortgage was applicable to the Nov. 1; 1987 due date—the present arrearage was $70,000. This meant that for eight years, the debtor continued to occupy the premises without paying any mortgage debt service or any occupancy charges. So the order of the bankruptcy court was affirmed.

In *Soares*, 107 F.3d. at 969, the court of appeals reversed an annulment order entered initially by the bankruptcy court, which had been affirmed by the district court. This opinion emphasizes the distinction between voidable ministerial acts vs. nonvoidable judicial acts arising from postpetition enforcement acts by secured creditors. This appeal arose from a chapter 13 petition filed the day before the entry of a foreclosure judgment by the Massachusetts state court.

As to what constitutes a ministerial act, the court characterizes that as entailing no exercise of discretion or judgment by a state court. In this case, the state court did not enter an order of default until two weeks after the stay became effective, and then permitted another week to go by before entering the judgment of foreclosure. The court emphasizes that a judicial act entails discretion or judgment, and in this case, it emphasizes that the court waited for the filing of an affidavit of the mortgagor's non-military service before entering the judgment. (As a former Massachusetts practicing lawyer, this Judge notes that the amount of discretion in reviewing a non-military service affidavit is nominal at best.)

Having found that there was a violation of the automatic stay, and no exception for a ministerial act; the *Soares* court then discussed whether the facts in that case warranted an annulment of the stay. To avoid creating incentives for violation of the stay, the court stressed that this form of relief is very exceptional—indeed, a "long-odds exception." Here the secured creditor had notice of the filing, but proceeded anyway, and without notifying the state court of what it had learned. Moreover, there was no finding of bad faith on the part of the debtor either by the bankruptcy court or in the record. As to any prejudice suffered by the secured creditor, it was the "author of its own misfortune." That is, it would have had to pay the taxes and costs of maintenance, had it not violated the stay. But the court restricted its ruling to the motion of clarification, and reversed the bankruptcy court for abuse of discretion. The secured creditor could now incur the costs and delay of moving once again for entry of a judgment and sale.

With *Soares*, we have come full circle. This decision bridges *48th St. Steakhouse*, and *Rexnord* in the context of a postpetition action to enforce a mortgagee's remedies. In *Soares*, the mortgagee had notice of the bankruptcy petition, but did not so advise the state court so that the court would abstain from any further judicial determinations in the state court foreclosure action. But the important point in *Soares* is that when equitable factors are shown that support annulment as a form of equitable relief, that is a legitimate exercise of the equitable discretion of the bankruptcy court in construing alleged violations of the automatic stay. *Soares* is the decision of a sister court of appeals that takes into consideration all of the reported decisions at that level, including the leading decisions in this Circuit. Under those circumstances, one may anticipate that the Sec-

ond Circuit would give *Soares* very careful and favorable consideration whenever dealing with a postpetition foreclosure action. *Bresler, DaSilva,* and *Nelson* properly present the nuanced treatment of this issue that should point the way for the Second Circuit.

As further support for the Second Circuit's reconsideration of *48th St. Steakhouse,* that court should also reintegrate the developing case law on "bad faith filings" in the context of chapter 13 cases, and revisit *In re Johnson,* 708 F.2d 865 (2d Cir.1983), which has been read by some lower courts for the proposition that repeated filings for chapter 13 relief are not per se evidence of a "bad faith" filing. The Circuit now has another fifteen years of reported cases at the trial and district court level that explore in considerable detail the patterns of abuses of bankruptcy process that serial chapter 13 filings pose to our courts. It is perhaps time to conclude that when a serial chapter 13 filer has not shown a materially favorable change in financial condition to warrant the continued administration of the last of a series of filings before the court, and the case should be dismissed with prejudice under the case law in this and other circuits, then under those circumstances, a sufficient showing has also been made for granting an annulment of the automatic stay as ancillary relief when a mortgagee has continued to enforce its remedies without notice of the present filing.

IV. Conclusion.

In light of the abuse of the bankruptcy process on at least four occasions by the debtor within a period of less than two years, the more than $10,000 incurred by Republic in foreclosure costs and fees (including advances to pay the accruing real estate taxes), the extended history of nonpayment for use and occupancy of the premises, the intentional decision not to notify the judgment creditor of the last filing in time to avert the scheduled foreclosure sale, and the utter impossibility of the debtor's confirming a feasible plan in this one-creditor case present a compelling showing of cause for the annulment of the automatic stay. To return to the narrow alternative holding in *Bresler,* the debtor in this case could not provide any adequate protection for Republic, and the property was not necessary for an effective reorganization, for no reorganization under chapter 13 was possible. Any equity which the debtor alleged in the property was at best thin. And to prevent any further abuse of the bankruptcy process, the trustee's motion to dismiss this case with prejudice to prohibit any further filing under chapter 13 for a period of 180 days should also be granted.

Republic is directed to settle an order, consistent with this opinion, on the debtor, the debtor's counsel, and the chapter 13 trustee, Sanford Weinberg, Esq. In framing this order, Republic should provide that the motion to annul the automatic stay shall be the first provision to become effective, and within ten days thereafter, the dismissal of this case with prejudice to the refiling for 180 days shall become effective. The Court shall retain jurisdiction for the limited purpose of determining the disposition of the $5,392.40 in "direct" postpetition payments to the mortgagee as well as any interim plan payments to the trustee. If within the next ten days the parties can settle that aspect of this matter, they should so advise the Court; if the matter is not settled, then within five business days thereafter, by the end of that ten day period, Republic must file a motion and supporting memorandum, and serve a notice of hearing on the debtor and the debtor's counsel in support of any claim of entitlement to those funds under either applicable state or federal bankruptcy law.